UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

MARK HASSAN,

                Plaintiff,

     -vs-

CITY OF ITHACA, NEW YORK; BRIAN H.
WILBUR, former Chief of the Ithaca
Fire Department, in his individual
and official capacity; J. THOMAS
DORMAN, Acting Chief of the
Ithaca Fire Department, in his
individual and official capacity;
MICHAEL SCHNURLE, Assistant Chief
of the Ithaca Fire Department, in
his individual and official
capacity; ROY TRASK, in his
individual and official capacity as
a Lieutenant with the Ithaca Fire
Department; ROBERT COVERT, in his
individual and official capacity
as a Lieutenant with the Ithaca
Fire Department; and JOHN and JANE
DOE(S),

              Defendants.

**DECISION and ORDER
No. 6:11-cv-06535(MAT)**

---

## I.   Introduction

Represented by counsel, Mark Hassan ("Plaintiff"), a former professional firefighter with the Ithaca Fire Department ("the IFD"), instituted this action against the City of Ithaca ("the City") and the individual defendants, all of whom are or were, at the relevant time, employees of the IFD (collectively, "Defendants"). Plaintiff asserts causes of action for employment discrimination, retaliation, and hostile work environment under

Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"); 42 U.S.C. § 1981 ("Section 1981"); the New York State Human Rights Laws, Executive Law § 296 ("NYSHRL"); and the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution and 42 U.S.C. § 1983 ("Section 1983"). Plaintiff alleges discriminatory and retaliatory treatment by Defendants on the basis of his ethnicity and national origin.

Following discovery, Defendants moved for summary judgment dismissing Plaintiff's amended complaint pursuant to Rule 56(c) of the Federal Rules of Civil Procedure ("Rule 56"). Plaintiff opposed the motion, and Defendants filed a reply. For the reasons set forth below, Defendants' motion is granted, and the amended complaint is dismissed in its entirety.

## II.  Factual Background

### A.   The Parties

Plaintiff identifies himself as being of Middle Eastern descent. His family came to the United States in 1903, and both his parents were born in the United States. Plaintiff was born in California and moved to New York as a child. He has lived in the United States all his life.

Defendant Brian Wilbur served as chief of the IFD from 1993, until he retired on August 29, 2009, and was responsible for hiring Plaintiff. J. Thomas Dorman was deputy chief at the IFD, and was

acting chief for a period of time after Wilbur's retirement. Michael Schnurle was a firefighter for about 35 years, after which he was promoted to lieutenant, and then to assistant chief in 2002. Robert Covert served as a "student bunker" and volunteer in the late 1980s and became a career firefighter in 1992; he was promoted to lieutenant in 2004. Roy Trask was a firefighter for 17 years and was promoted to lieutenant in 2007.

**B.   Plaintiff's Employment at the IFD**

After spending some time as a volunteer "bunker" for the IFD, Plaintiff was hired as a firefighter ("FF") on a contingency basis in February 1996.[1] In March of 1997, Plaintiff successfully completed his probationary period and became a full-time firefighter with the IFD. On July 25, 1999, Plaintiff began working in the Fire Prevention Bureau ("FPB"), a specialized unit within the IFD, working under then-Assistant Chief ("AC") Ray Wheaton. Plaintiff's documented conflicts with co-workers and others began during his tenure on the FPB, as referenced in a memo dated April 10, 2000, from Chief Wilbur to Plaintiff memorializing a discussion among Chief Wilbur, AC Wheaton and Plaintiff regarding Plaintiff's deteriorating relationship with the other code

---

[1]

During the interview process, Plaintiff suggested that he could be considered a minority hire on the basis that he qualified for VESID due to an injury he sustained while in the Navy; he did not mention his ethnicity or national origin. Because his civil service exam scores were sufficiently high, it was not necessary to rely on his VESID eligibility.

inspectors in the City. (H.419;[2] Hassan 205[3]). In September of 2000, Plaintiff requested a transfer out of the FPB in order to return to shift-work. According to Plaintiff, the reason for his transfer request was "stress" because he allegedly was being singled out for criticism and discipline by AC Wheaton. (H.421). Chief Wilbur denied the request on November 3, 2000, citing the value he believed Plaintiff brought to the FPB. (H.423). Plaintiff eventually was transferred out of the FPB effective December 31, 2001. (H.346). Plaintiff eventually was transferred out of the FPB effective December 31, 2001. (H.346).

Plaintiff sustained injuries on the job three times between January 1, 2002, and October 23, 2004. (H.431-37, 445-46, 449-50). On October 23, 2004, after injuring his back during a rescue training exercise, Plaintiff was prescribed hydrocodone, but it caused intestinal upset so he stopped taking it. Plaintiff admitted to procuring Oxycontin "from [his] own source[,]" (Hassan 39-40, 42), which he took while on duty at the IFD. Plaintiff carried two tablets crushed up in his pocket or sock, and secretively ingested it at work by snorting it or dissolving it in a glass of water. (Id. 41, 50-52). Plaintiff testified that he did not tell his

---

[2]

Citations to "H.___" refer to Bates-stamped documents (Dkt #66-4) submitted by Defendants' in support of their summary judgment motion.

[3]

Deposition transcripts will be cited in parentheses, with the surname of the witness followed by the relevant transcript page numbers. Deposition transcripts have been submitted by both Plaintiff and Defendants in connection with the pending summary judgment motion.

supervising lieutenant he was taking Oxycontin while on duty. (Id. 50).

On September 1, 2005, AC Guy VanBenschoten, Plaintiff's shift supervisor, sent him a memo documenting five points he had discussed with Plaintiff with respect to problematic workplace behaviors, including "yelling when there is no emergency reason to do so," and engaging in "bullying behavior." (H.451). On November 9, 2005, Chief Wilbur met with Plaintiff, the two Union representatives, and then-DC Dorman to discuss the deteriorating relationship between Plaintiff and AC VanBenschoten. Plaintiff stated that he was under "stress" working with AC VanBenschoten and expressed a willingness to leave the shift.

On December 21, 2005, Union representative FF Brian Weinstein sent an email to Chief Wilbur stating that AC VanBenschoten did not want to work with Plaintiff any longer because he "fear[ed] for his personal mental health and physical well being." (H.461). On December 29, 2005, Chief Wilbur and DC Dorman met with Plaintiff to discuss his transfer request and reviewed the City's Vision, Mission and Values Statement, Diversity Statement, and Human Resource Manual section on Threats and Violence in the Workplace. (H.497-500). During this meeting, Plaintiff did not assert that he had been subjected to ethnic or racial epithets, harassment, or discrimination of any sort. (Hassan 95-98). Plaintiff ultimately was transferred from AC VanBenschoten's shift to the C Shift,

reporting to AC Lee LaBuff. (H.475-76). On February 10, 2006, Chief Wilbur sent a follow-up memo to Plaintiff discussing the December 29, 2005, meeting and emphasizing his "expectations for professional conduct at all times, including mutually respectful behavior, with no hostile behaviors such as unreasonable teasing or offhand comments that are offensive or disrespectful." (H.497-500).

During 2006 to 2009, Plaintiff was alleged to have purposefully delayed in both responding to, and assisting at, emergency medical service ("EMS") calls; to have driven dangerously and aggressively while en route to calls; to have refused to comply with IFD directives, e.g., that firefighters responding to calls from the station were to be fully dressed in their gear before arriving on the scene; and to have engaged in dangerous and threatening behaviors toward certain firefighters whom he did not like. See Defendants' Statement of Undisputed Material Facts ("Defs' SUMF") (Dkt #66-2), ¶¶ 29-39 and exhibits cited therein.

On March 7, 2009, during a hazardous materials training and shift briefing, AC LaBuff witnessed Plaintiff yelling for no legitimate reason and engaging in disruptive and threatening behavior. The following day, AC LaBuff sent an email to Chief Wilbur, stating in part as follows: "I have worked very hard to meet [Plaintiff] halfway, he offers no flexibility, [and] . . . he works very hard to undermine me as well as many other officers. I am concerned for my safety, and I am worried that I will be

apprehensive in decision making . . . . Therefore, I am requesting immediate removal of [Plaintiff] from the A shift." (H.640). On March 9, 2009, Chief Wilbur sent Plaintiff a letter referencing the March 7, 2009, incident and placing him on involuntary leave pending a medical examination under Civil Service Law Article 72.1 to determine whether he was fit for duty. (H.83-84). On April 16, 2009, Chief Wilbur sent a letter to Plaintiff explaining his reasons for requiring the examination. (H.130-36). The letter referenced more than a dozen instances of Plaintiff having conflicts with other employees and exhibiting problematic workplace behaviors. These included repeated requests by Plaintiff to be transferred off shifts, and requests from fellow fire fighters to be transferred off shifts so as to not have to work with Plaintiff;[4] a pattern of Plaintiff "acting out" and displaying "an increasing lack of tolerance for specific individuals" and "disruptive, hostile, or emotionally abusive behaviors that generate anxiety or create a climate of distrust that adversely affects productivity and morale in the workplace"; failure to meet minimum standards of conduct previously discussed with Plaintiff; repeatedly making references to being "off his meds"; taking sick

---

[4]

Chief Wilbur noted Plaintiff's last three shift assignments had resulted in requests for transfer, either by Plaintiff or by others, and "[t]he nature of the correspondence and notes surrounding each transfer indicates . . . the transfer requests are made by [Plaintiff] to get away from coworkers or others to get away from [Plaintiff]. . . . Significant components of this situation are allegations of harassment or intimidation of other fire fighters [by Plaintiff]." (H.130). Chief Wilbur noted that "[a]s compared with [Plaintiff's] peers, this behavior is unusual in our environment." Id.

leave when his favored lieutenant was off-duty; allegations of unreasonable delay in responding to emergency medical calls; refusing to cooperate with acting officers and others; using racial slurs; engaging in "loud and abusive behavior" and "actions while operating fire department apparatus that could frighten and/or seriously injure a fellow employee [FF Pete Snell]"; Plaintiff making comments to "intimidate or frighten a co-worker"; using sick leave at a higher rate than his peers; statements by multiple co-workers (AC VanBenschoten, FF Snell, and AC LaBuff) "all indicating a fear for their personal safety as a result of intimidation" by Plaintiff; and in inappropriate behavior during the March 7, 2009 shift training event, i.e., an "increasing level of frustration, appearing distraught, and speaking in a very loud and angry voice" and making "accusations . . . against chief officers . . . that were very concerning." In Chief Wilbur's opinion, Plaintiff's actions could not be explained as "simple act[s] ·of misconduct" but instead seemed likely to have an underlying medical component. (H.134-35).

Plaintiff underwent an Article 72 examination by psychiatrist John Bezirganian, M.D., whose report (H.210-14) contains no reference by Plaintiff to his ethnicity or national origin. Nor does it reflect that Plaintiff made any complaints about suffering harassment or discriminatory treatment at the IFD based on his

ethnicity or national origin. Dr. Bezirganian concluded that
Plaintiff

> does not pose a risk to the safety of others due to a
> psychiatric condition; he may choose to bully others as
> a personal choice, but he is capable of controlling such
> actions if he wishes. No accommodations are required to
> enable Mr. Hassan to perform his work from a psychiatric
> standpoint. . . .

(H.214). Plaintiff's medical leave accordingly was terminated.

Chief Wilbur then issued a Notice of Discipline to the
Plaintiff on June 24, 2009 ("the 2009 NOD"), citing many of the
same incidents discussed in the letter ordering the Article 72
examination and seeking a two-month suspension and other lesser
penalties. (H.240-43).

After Plaintiff returned to work, he was transferred on July
20, 2009, to the B shift supervised by AC Schnurle in the central
fire house. Plaintiff was assigned to Engine 901, under the direct
supervision of Lieutenant ("Lt.") Trask. Chief Wilbur retired on
August 29, 2009, and DC Dorman became Acting Chief. According to AC
Schnurle and Lt. Trask, tensions between Plaintiff and his co-
workers on the B shift continued, as evidenced by two senior
firefighters requesting to be transferred to outside stations
effective 2010. AC Schnurle prepared several emails to Acting Chief
Dorman documenting his frustrations and other shift members'
frustrations with Plaintiff "leaving work sick and being agitated",
"not [being] interested in participating in anything other than
what he is told to do, directly related to performing his job";

-9-

having an "un-kept [sic] appearance"; distancing himself from other shift members and not being much of a team player. (H.14-16). Although AC Schnurle discussed these issues with Acting Chief Dorman, he did not send any of these emails and, when asked if he wanted to make the complaint "official", stated that he did not want to give up on Plaintiff.

Matters came to a head on April 14, 2010, when Plaintiff announced that he was going home "sick" due to "stress"; firefighter Pete Snell happened to be acting lieutenant on the previous shift and there was a potential for interaction between Plaintiff and Snell, whom Plaintiff disliked. When AC Schnurle asked Plaintiff if he wanted the matter to be taken to the next level, Plaintiff replied that he did not care; he was going home sick. AC Schnurle then notified Acting Chief Dorman of this incident and sent to him the previously unsent emails detailing his concerns with Plaintiff's unprofessional, threatening, and disruptive behavior and attitude. Plaintiff consequently was placed on a 30-day paid investigative suspension while the charges against him were investigated. (H.17).

When the 30-day leave expired, Plaintiff was placed on indefinite paid administrative leave beginning May 14, 2010. (H.18). On May 20, 2010, Acting Chief Dorman issued a Notice of Discipline ("the 2010 NOD") (H.22-24) indicating that the City was commencing disciplinary action against Plaintiff based the three

charges of misconduct: making threatening statements in March/April 2010 (Charge #1);[5] insubordination on April 14, 2010, towards AC Schnurle (Charge #2); and creating a hostile work environment beginning in June 2009 (Charge #3). The 2010 NOD sought Plaintiff's termination.

The Union demanded arbitration on June 1, 2010, but it failed to select an arbitrator or otherwise advance the proceedings.

On November 29, 2010, Plaintiff, through counsel, filed a complaint with the Equal Employment Opportunity Commission ("EEOC"), asserting that he had suffered discrimination at the IFD as a consequence of his being of Middle Eastern descent. (H.25-31). Plaintiff requested and received a notice of the right to sue from the EEOC in April of 2011, a copy of which was received by the City on April 12, 2011. (H.61).

On April 5, 2011, the City's attorney notified the Union that due to its inaction in moving forward with the arbitration proceedings, Plaintiff's employment was being terminated effective immediately.

---

[5]

After AC Schnurle learned of Plaintiff's suspension, he met with some of his shift members off duty, at which time firefighter Dean Hathaway reported to Schnurle that Plaintiff had commented that he had access to a 55-gallon drum, fertilizer and diesel fuel, and he knew how to make a bomb out of those materials. (H.11-12; Schnurle 93-94). Firefighter Greg Stilwell stated that he had heard Plaintiff say, while backing the ladder truck into the central fire station and seeing that there were other shift members and officers standing in the apparatus room, that if he "'just floored it he could go right through the apparatus room and wipe everyone out.'" (H.11-12; Schnurle 93). These remarks formed the basis of Charge #1 in the 2010 NOD.

On June 9, 2011, the Union notified Plaintiff that after interviewing all the witnesses he identified with respect to the 2009 NOD, its view remained that the "[suspension] case is 'not winnable[.]'" However, the Union noted, its Executive Board had not yet determined its position on the 2010 NOD seeking Plaintiff's discharge. (Union Disclosures ("UD"), Pt. 3, TT). On July 25, 2011, the Union sent Plaintiff a letter reminding him that his cases commenced before arbitrator Judith LaManna, Esq. ("the Arbitrator") on July 27, 2011, at City Hall. The Union noted,

> Although all of your communications have clearly stated that you will not attend, we wanted to advise you again of the date and time of the hearings. . . . The Article 72 case and 2 Month suspension case–the Union is not contesting. In the discharge case the Union is NOT CONTESTING THE FACTUAL CHARGES BUT CONTESTING THE DISCHARGE ITSELF BY asking for a vocational/psychological evaluation of you. . . .

(UD, Pt. 3, UU) (capitals in original).[6]

The Arbitrator granted the Union's request for a psychiatric exam. (H.267-79). On August 5, 2011, Plaintiff was examined by clinical psychologist Gail Oswald, D. Psy. In her report (H.1-4), Dr. Oswald stated that Plaintiff's description of himself as "volatile, loud, abrasive and demanding" was accurate, and that "his drug use [cocaine while off duty and Oxycontin on duty] aggravated his already volatile nature and made it impossible for

---

[6]

At his deposition, Plaintiff justified his failure to attend the arbitration by stating that his understanding was that he "wasn't allowed to be there" because he "wasn't allowed to be on City property." (Hassan 25-26).

him to cope with job stress." In Dr. Oswald's opinion, "as long as [Plaintiff] continues to abuse drugs, he is psychologically unfit for duties as a firefighter." (H.4).

The Arbitrator issued her opinion on September 22, 2011, finding that the 2009 NOD was issued for "just cause," and that Plaintiff had committed all but one of the acts charged therein.[7] The Arbitrator further found that Plaintiff had made the threatening statements reported by to AC Schnurle in April 2010 (i.e., that he had a 55 gallon drum, diesel fuel and fertilizer, and that he could drive a fire truck through the apparatus room and eliminate everyone in it; and that he had engaged in a "rant and yell" session with AC Schnurle on April 14, 2010, and had gone home "sick" to avoid working with someone he did not like, and that these were acts of disrespect and insubordination. (H.276).

Additionally, the Arbitrator concluded, the City satisfied the just cause standards to terminate him as of the 2010 NOD. The Arbitrator observed that at each juncture, the City "investigated [Plaintiff's] circumstances, gave him direction to correct his behavior, and adjusted his objected-to supervision and assignment," but Plaintiff refused to change his behavior. The Arbitrator noted that Plaintiff was "not entitled to hide behind his repeated self-description that his personality is 'colorful and animated'"

---

[7]

The Arbitrator found that specification 8, charging Plaintiff with "engag[ing] in problematic behavior on multiple occasions", lacked specificity.

given that he "knew his behavior was received by others as threatening and intimidating and that it was in direct violation of the [Workplace Violence] and [Standards of Conduct] policies." Moreover, the Arbitrator found, there was "no showing that [Plaintiff] was treated unequally. (H.277). The Arbitrator concluded that

> [Plaintff's] behavior since before 2009—proven to be disrespectful, insolent, indolent, uncooperative, insubordinate and threatening of others—is not to be tolerated in any employment setting, and particularly in light of the many notices and opportunities given to him to address and correct same. Such behavior is excessively out of place in a quasi-military operation such as a Fire Department.

(H.278).

## III. Summary Judgment Standard

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. See FED. R. CIV. P. 56(a). The party moving for summary judgment initially bears the burden of demonstrating the absence of a genuine issue of material fact. Adickes v. S.H. Kress and Co., 398 U.S. 144, 157 (1970). The non-movant then has the burden of coming forward with "specific facts showing that there is a genuine issue for trial," FED. R. CIV. P. 56(e), which requires "a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In determining whether

there is a genuine issue of material fact requiring trial, the court is "'required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'" Johnson v. Killian, 680 F.3d 234, 236 (2d Cir. 2012) (quoting Terry v. Ashcroft, 336 F.3d 128, 137 (2d Cir. 2003); internal quotation marks omitted in original). Nonetheless, the Court still must inquire whether "there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and may grant summary judgment if the non-movant's evidence is "merely colorable" or "is not significantly probative[.]" Id. at 249-50 (citations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quotation omitted).

## IV.  Discussion

### A.  The Title VII Claims Based on Discriminatory Termination and Retaliation

Title VII protects individuals from discriminatory employment practices because of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a)(1)-(2). "[I]ndividuals are not subject to liability under Title VII." Patterson v. County of Oneida, 375 F.3d 206, 221 (2d Cir. 2004) (citation omitted).

Therefore, Plaintiff's Title VII claims against the individual defendants (Chief Wilbur, DC Dorman, AC Schnurle, Lt. Covert, and Lt. Trask) must be dismissed as a matter of law.

Both wrongful termination and retaliation claims brought pursuant to Title VII are analyzed under the three-step burden-shifting framework established in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973) ("<u>McDonnell Douglas</u>"). <u>E.g.</u>, <u>Sanchez v. Conn. Natural Gas Co.</u>, 421 F. App'x 33, 34-35, 2011 WL 1624981, at *1 (2d Cir. 2011) (unpublished opn.) (citation omitted). If the plaintiff bears his initial burden of establishing a <u>prima facie</u> case of discrimination, <u>Holcomb v. Iona Coll.</u>, 521 F.3d 130, 138 (2d Cir. 2008), the employer must "articulate a legitimate, clear, specific and non-discriminatory reason" for its action. <u>Holt v. KMI-Continental, Inc.</u>, 95 F.3d 123, 129 (2d Cir. 1996) (citation omitted). "[T]he plaintiff has the ultimate burden to prove that the employer's reason was merely a pretext for discrimination." <u>Id.</u> (citations omitted).

### 1. Discriminatory Termination

#### a. <u>Prima Facie</u> Case

The requirements of a <u>prima facie</u> Title VII claim are "minimal." <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 506 (1993) ("<u>Hicks</u>") (citation omitted), and require the plaintiff to "show that (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment

action; and (4) the adverse action took place under circumstances giving rise to [an] inference of discrimination." Ruiz v. County of Rockland, 609 F.3d 486, 491-92 (2d Cir. 2010) (citation omitted). For purposes of this motion, the Court assumes that Plaintiff has made out a prima facie case.

The City now has "the burden of producing, '"through the introduction of admissible evidence,"' reasons for its actions which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action.'" Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 37 (2d Cir. 1994) (quoting Hicks, 509 U.S. at 507) (further quotation omitted; emphasis in Hicks)). The Supreme Court has emphasized that "although the McDonnell Douglas presumption shifts the burden of production to the defendant, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" Hicks, 509 U.S. at 507 (quotation omitted; alteration in Hicks). Here, Defendants have come forward with admissible evidence of numerous legitimate and nondiscriminatory reasons for  their actions, namely, a series of increasingly severe behavioral issues and workplace policy violations by Plaintiff, as detailed in the 2009 NOD and 2010 NOD, and the supporting documentation attached to Defendants' Statement of Undisputed Material Facts. As noted above, the Arbitrator found that Plaintiff had committed all but one of

the acts charged in the 2009 NOD. As to the 2010 NOD, the Arbitrator determined that Plaintiff had made the threatening statements reported by two of his co-workers to AC Schnurle in April 2010, and that Plaintiff had been insubordinate and disrespectful to AC Schnurle on April 14, 2010.

Courts are permitted to consider an arbitrator's findings to be probative evidence. See, e.g., Stokes v. General Mills, Inc., 754 F. Supp. 312, 316 (W.D.N.Y. 1991) (in Title VII case, court considered the findings of an arbitrator and administrative law judge that employee had engaged in misconduct, as "probative evidence") (citing Fitch v. R.J. Reynolds Tobacco Co., 675 F. Supp. 133, 138 (S.D.N.Y. 1987) (in Title VII case, district court may consider previous findings of administrative law judge as evidence)). Especially since neither the Union nor Plaintiff contested any of the factual allegations in either the 2009 NOD or 2010 NOD during the Arbitration, the Court considers the Arbitrator's factual findings to be highly probative and affords them conclusive weight. The City has amply fulfilled its burden of producing not just one reason, but multiple legitimate, non-discriminatory reasons for terminating Plaintiff's employment. See, e.g., Hollander v. American Cyanamid Co., 172 F.3d 192, 199-200 (2d Cir. 1999) (finding that a consistently documented record of employee's interpersonal problems satisfied defendant's burden of producing a non-discriminatory motive).

### b.   Evidence of Pretext

Plaintiff now must "establish a genuine issue of material fact either through direct, statistical or circumstantial evidence as to whether [his] employer's reason for discharging [him] is false and as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse employment decision." Gallo v. Prudential Residential Servs. Ltd., P'ship, 22 F.3d 1219, 1225 (2d Cir. 1994). At this stage, courts should consider "a number of factors" which "include [1] the strength of the plaintiff's prima facie case, [2] the probative value of the proof that the employer's explanation is false, and [3] any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148-49 (2000).

With regard to the first Reeves factor, the evidence of discriminatory animus is exceedingly weak. With regard to the 2009 NOD, Plaintiff states in his discovery responses only that FF Snell "made frequent derogatory comments referencing Plaintiff's ethnicity such as 'your people don't know shit' and 'why don't you go back where you came from.'" Plaintiff's Memorandum of Law ("Pl's Mem.") (Dkt #69) at 8 (citations to record omitted). It is undisputed that FF Snell did not have supervisory responsibility over Plaintiff and had no authority to discipline Plaintiff or take any other adverse employment action against him. Thus, even

assuming that these comments constitute objective evidence of racial animus, they were not made by anyone associated with the decision to discipline Plaintiff, rendering them of little, if any, probative value. See, e.g., Desir v. Board of Co-op. Educ. Servs. (BOCES) Nassau Cty., 803 F. Supp.2d 168, 179 (E.D.N.Y. 2011) ("[E]ven if these comments could be viewed objectively as evidence of racial animus, they were not made by anyone associated with the decision to terminate Plaintiff; they were made by children in his classroom[.]") (citing Haskell v. Kaman Corp., 743 F.2d 113, 120 (2d Cir. 1984)). Moreover, "stray remarks, *even if* made by a decisionmaker, do not constitute sufficient evidence to make out a case of employment discrimination." Danzer v. Norden, 151 F.3d 50, 56 (2d Cir. 1998) (citing Woroski v. Nashua Corp., 31 F.3d 105, 109-10 (2d Cir. 1994); emphasis supplied).

Plaintiff also argues that FF Snell's comments are significant because he (FF Snell) "prompted" the 2009 disciplinary action. See Pl's Mem. (Dkt #68-3) at 8. This statement is not supported by the record. The relevant correspondence from Chief Wilbur to Plaintiff indicates that the immediate cause of the 2009 NOD was Plaintiff's unprofessional outburst during the March 7th training event, which was reported to Chief Wilbur by Plaintiff's shift supervisor, AC LaBuff—not by FF Snell. Plaintiff does not allege that Chief Wilbur or AC LaBuff ever used disparaging ethnic epithets in general or specifically toward Plaintiff. Although two

of the incidents in the 2009 NOD for which Plaintiff was disciplined involved FF Snell,[8] the remaining charges had nothing to do with him. Indeed, the 2009 NOD did not in any way involve FF Snell's allegedly discriminatory remarks. The Court cannot find that Plaintiff has come forward with facts sufficient to raise an inference of discriminatory treatment surrounding the 2009 NOD.

With respect to the 2010 NOD, Plaintiff attempts to show discriminatory animus by asserting that AC Schnurle's allegations formed the basis of the charges, and that he had "used ethically disparaging terms," namely, "'towel head' and 'sand nigger.'" Pl's Mem. at 8 (quotations to record omitted). Plaintiff testified about only one instance of such a remark being directed at him personally. According to his deposition testimony, sometime after the September 11, 2001, terrorist attacks, while a group of firefighters was watching a documentary about American troops in Afghanistan, AC Schnurle looked straight at him and called him a "fucking sand nigger." (Hassan 19-20). In his Amended Complaint,

---

[8]

The first specification for the charge of harassment and intimidation of co-workers stated that "on 01 JUN 08, . . . [Plaintiff] [was] driving E 909, which was nosed toward the rope tower. [Plaintiff] backed up toward the north gate and then drove forward. As [Plaintiff] drove forward, [he] came down the side of E 906, coming up behind FF Snell close enough that he thought that he was going to be struck. FF Snell threw open the engine door to protect himself and [Plaintiff] swung wider and drove by, missing the edge of the door by approximately six inches. [Plaintiff] kept on driving and parked. . . . FF Snell observed [Plaintiff] looking back at him through the mirror, smiling." (H.240). The second specification stated that "[o]n two occasions in 2008, in the presence of FF Snell, . . . [Plaintiff] repeatedly and loudly asked co-workers where you could purchase an AR-15. On one of these occasions, [Plaintiff] made noises like a shotgun racking and stated 'this is the noise·that he is going to hear' in a manner that FF Snell understood to be directed at him." (H.241).

-21-

however, Plaintiff alleges that in February 2010, AC Schnurle "became upset at a television broadcast on Afghanistan, turned to Plaintiff and stated, 'You fuckin' towel heads' and left the room shaking his head." Amended Complaint ("Am. Comp.") (Dkt #33), ¶ 17. AC Schnurle admitted to using the term, "towel heads" while he and some co-workers were watching the above-mentioned television show, but testified that he did not direct it toward Plaintiff; rather, he used it to refer to the Taliban. (Schnurle 14-15). Whether AC Schnurle used the term "sand nigger" or "towel head" on the occasion in question, it is a classic stray remark and insufficient to defeat summary judgment. See Danzer, 151 F.3d at 56 (noting that a stray comment, without more, "cannot get a discrimination case to a jury"). Although AC Schnurle was in a supervisory position over Plaintiff, he did not at any point have the authority to institute disciplinary actions against Plaintiff, and he was not responsible for issuing the 2010 NOD. Furthermore, Plaintiff does not allege that Acting Chief Dorman, who was responsible for issuing the 2010 NOD, ever used disparaging ethnic epithets in general or specifically toward Plaintiff. The Court cannot find that Plaintiff has come forward with facts sufficient to raise an inference of discriminatory treatment surrounding the 2010 NOD.

Plaintiff also attempts to show that discriminatory intent motivated the adverse employment actions based on a "disparate treatment" theory, see Pl's Mem. at 9-11. "Raising such an

inference . . . requires the plaintiff to show that the employer treated him or her 'less favorably than a similarly situated employee' outside of the protected group." <u>Raspardo v. Carlone</u>, 770 F.3d 97, 126 (2d Cir. 2014) (quoting <u>Graham v. Long Island R.R.</u>, 230 F.3d 34, 39 (2d Cir. 2000)). "An employee is similarly situated to co-employees if they were (1) subject to the same performance evaluation and discipline standards and (2) engaged in comparable conduct." <u>Ruiz</u>, 609 F.3d at 493-94 (internal quotation marks omitted); <u>see also Raspardo</u>, 770 F.3d at 126 (In the context of employee discipline, "the plaintiff and the similarly situated employee must have 'engaged in comparable conduct,' that is, conduct of 'comparable seriousness.'") (quotation and some internal quotation marks omitted). The Second Circuit has stated that "[a]s a general rule, whether items are similarly situated is a factual issue that should be submitted to the jury[,]" but the rule is "not absolute" and "a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met." <u>Harlen Assocs. v. Incorporated Vill. of Mineola</u>, 273 F.3d 494, 499 n. 2 (2d Cir. 2001) (internal and other citations omitted).

In support of his disparate treatment argument, Plaintiff cites only to his own interrogatory responses setting forth alleged examples of IFD employees not being disciplined or terminated for allegedly similar conduct. <u>See</u> Pl's Mem. at 10-11 (citing

Plaintiff's Responses to Interrogatories ##6 & 9). Plaintiff does not identify pertinent dates or even time-frames for these incidents. Nor does Plaintiff indicate that the alleged comparators are outside of his protected class. These deficiencies aside, if credited, Interrogatory #6 does name several individuals who allegedly engaged in harassing or aggressive conduct toward co-employees.[9] However, Plaintiff specifies but one incident of alleged misconduct per each of the individuals named. Thus, he has identified isolated incidents by the purported comparators, not the persistent pattern of misconduct and refusal to comply with accepted norms of workplace behavior Plaintiff is alleged to have displayed. See, e.g., Ruiz, 609 F.3d at 495 ("Because Mr. Ruiz has not identified a similarly-situated employee who faced *equally serious* allegations and whom Commissioner Walsh-Tozer allowed to remain on the job, Mr. Ruiz has failed to raise an inference of discrimination.") (emphasis supplied); see also Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992) (finding that disparate treatment plaintiff did not produce sufficient information about one co-worker's alleged absenteeism and other co-worker's insubordination to indicate whether the absenteeism and

---

[9] According to Plaintiff, on unspecified dates, Firefighter Smith "assault[ed] and batter[ed]" firefighter Harding after Harding reported Smith as derelict in his duties; Firefighter Bardo threw a teapot at an administrative assistant; and then-firefighter Schnurle "threaten[ed]" firefighter Whitney "with bodily harm in the presence of Defendant Dorman and others." Pl's Mem. at 10 (citation to discovery responses omitted).

insubordination were of "comparable seriousness" to the conduct for which Plaintiff was discharged). The Court therefore finds that no reasonable juror could conclude that Plaintiff is similarly situated to the employees identified in Interrogatory #6.

The vast majority of the individuals identified in Plaintiff's response to Interrogatory #9 are even less similar, insofar they are not alleged to have engaged in bullying, threatening, or insubordinate conduct. Plaintiff alleges that Chief Wilbur certified a promotional list after learning that several fire fighters had cheated on the test, "namely, upon information and belief, Mark Spetelini, Covert, and Jill Sharpe." "Allegations of disparate treatment made without personal knowledge and unsupported by admissible evidence do not satisfy even the minimal burden which a plaintiff faces at the prima facie stage of proceedings." Wang v. N.Y.C. Dep't of Finance, No. 96-CV-5170(JG), 1999 WL 529550, at *14 (E.D.N.Y. July 21, 1999) (citations omitted). Furthermore, Plaintiff is not similarly situated to Chief Wilbur because Chief Wilbur was Plaintiff's supervisor and had different responsibilities. See, e.g., Winston v. City of N.Y., No. 12-CV-0395 FB VVP, 2013 WL 4516097, at *2 (E.D.N.Y. Aug. 23, 2013) (allegation of disparate treatment insufficient to raise inference of discriminatory intent where proposed comparators were plaintiff's superiors and she did not allege that she was either similarly situated or subject to the same workplace standards)

(citing, <u>inter alia</u>, <u>Prescod v. American Broad. Co.</u>, No. 77 Civ. 6125 (JFK), 1985 WL 430, at *14 (S.D.N.Y. Mar. 19, 1985) ("Supervisors are not similarly 'situated employees.'"); <u>Ombu v. Children's Television Workshop</u>, 516 F. Supp. 1055, 1062 (S.D.N.Y. 1981)).

Plaintiff alleges that firefighter Patrick Sullivan misused work time and IFD vehicles, and fabricated of inspection records on unspecified dates; that firefighters Hamilton and St. Dennis were "habitually late and known to sleep on duty"; and that St. Dennis used sick time on one occasion to attend a social event. Again, these allegations do not reflect misconduct, absenteeism, or insubordination at a level anywhere approaching that which Plaintiff was found by the Arbitrator to have committed. <u>See</u>, <u>e.g.</u>, <u>Rivera v. City and Cty. of Denver</u>, 365 F.3d 912, (10th Cir. 2004) (Hispanic former city employee failed to establish that similarly-situated employees who violated work rules of comparable seriousness were disciplined less harshly, as would demonstrate that employer's proffered non-discriminatory reason for discharge (that employee falsified work reports and induced a co-worker to support his lies), was pretext for discrimination; although employee presented evidence that one employee was suspended for three days after he verbally abused his supervisors and co-workers, another employee was suspended for one day for threatening another person, and another employee received a counseling memorandum for

making vulgar remarks at work and was reprimanded for shouting, the misconduct of those employees could reasonably be viewed as less seriousness than dishonesty displayed by discharged employee).

Plaintiff asserts that firefighters Schnurle, Michael Hagan, and Carl Smith purchased stolen tires for their personal vehicles on City property in 2009. Although this allegation represents a serious level of dishonesty, it is an isolated incident, rather than a pattern of misconduct. Also, there is no indication that it occurred while these individuals were on duty.

Plaintiff also states that firefighters Smith and Weinstein damaged a fire truck because Weinstein failed to observe the fire truck while Smith was backing it up, in violation of IFD policy. This is a single incident of, at most, negligence, rather than the deliberate misconduct displayed by Plaintiff over many years.

Plaintiff contends that, on unspecified dates in "the late 1990s," firefighter Otis Jackson collected pay for work he did not perform by paying new hires to work his shift at a reduced rate. Although an example of dishonesty, the nature of this alleged misconduct is not sufficiently similar to Plaintiff' misconduct for Jackson to be considered similarly situated. Furthermore, there is no indication that anyone at the IFD knew of Johnson's alleged practice. See Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64-65 (2d Cir. 1997) ("It is impossible to demonstrate that UPS treated similarly situated males differently when there is no

-27-

evidence that UPS knew about any other violations of the 'no fraternization' rule.").

Plaintiff asserts that Acting Chief Dorman "regularly" came to work and operated vehicles while under the influence of alcohol. Acting Chief Dorman is not similarly situated to Plaintiff because he was above Plaintiff in the chain of command and had different responsibilities. See, e.g., Winston, 2013 WL 4516097, at *2 (citations omitted).

According to Plaintiff, firefighter Smith "regularly" reported for duty in an intoxicated state and under the influence of marijuana. Plaintiff does not indicate that Smith's superiors knew of his drug and alcohol use on the job. See Shumway, 118 F.3d at 64-65 ("It is impossible to demonstrate that UPS treated similarly situated males differently when there is no evidence that UPS knew about any other violations of the 'no fraternization' rule."). Furthermore, although Plaintiff admits he worked shifts while under the influence of Oxycontin, a controlled substance, he was never disciplined for such conduct; indeed, none of his co-workers or supervisors were aware that he was doing this. Thus, Smith's alleged drug use on the job is irrelevant in this circumstances of the present case.

The Court turns next to the second factor in Reeves, the probative value of any evidence that the employer's reason is pretextual. Here, the case for finding pretext is essentially non-

existent, as Plaintiff's "evidence" consists only of his own subjective belief in the falsity of Defendants' reasons for terminating him. See Rodriquez v. American Friends of Hebrew Univ., Inc., No. 96CIV0240 GEL, 2000 WL 1877061, at *5 (S.D.N.Y. Dec. 26, 2000) ("[W]here plaintiff's own testimony is the only basis for contesting otherwise strong evidence of valid, non-discriminatory reasons for termination, the evidence of 'pretext' cannot alone support a reasonable inference of prohibited discrimination.").

In stark comparison to Plaintiff's inability to allege facts sufficient to support an inference that the justification for his discharge was pretextual, the City has "produced copious contemporaneous evidence[,]" Griffin v. Ambika Corp., 103 F. Supp.2d 297, 310 (S.D.N.Y. 2000), documenting Plaintiff's history of interpersonal conflicts with supervisors and co-workers, disciplinary problems, refusal to accept employer-provided counseling, and persistence in engaging in conduct violative of workplace norms in general and IFD policy in particular. Given this disparity, the Court concludes that no reasonable jury could find in Plaintiff's favor, i.e., could determine find that his discharge (after years of progressive discipline) was the result of unlawful discrimination. See id. (granting summary judgment to employer where, in the face of employer's well-documented record of plaintiffs' misbehavior, plaintiffs offer only conclusory allegations") (citing McLee v. Chrysler Corp., 109 F.3d 130, 135

(2d Cir. 1997) (affirming summary judgment where the record "establishes indisputably that, for race-neutral reasons, [plaintiff's] performance was not satisfactory"); <u>Gallo</u>, 22 F.3d at 1224 ("When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight . . . a grant of summary judgment is proper."); other citations omitted).[10]

## B.   Hostile Work Environment Under Title VII

In order to withstand summary judgment on a hostile work environment claim, the plaintiff "must produce evidence that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment.'" <u>Whidbee v. Garzarelli Food Specialities, Inc.</u>, 223 F.3d 62, 69 (2d 2000) (quotation and internal citations omitted)). The harassment shown "must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be abusive." <u>Alfano v. Costello</u>, 294 F.3d 365, 374 (2d Cir. 2002) (quotation omitted).

Here, although Plaintiff asserts that his co-workers "routinely" used ethnically and racially derogatory terms towards

---

[10]

The Court need not consider the third <u>Reeves</u> factor, other evidence supporting the defendant's case that properly may be considered on summary judgment, because the first two factors conclusively favor a finding that the City's reasons for termination Plaintiff were not pretextual.

others and towards him specifically, his deposition testimony identified only a handful of incidents over the course of 14 years at the IFD. Plaintiff testified that he had heard the word "nigger" used at unspecified times by unidentified individuals, and had heard firefighter Tom Deis called a "sand nigger" and "wetback." (Hassan 89-90). However, there is testimony that Deis occasionally referred to himself as a "wetback". (Trask 194). Several firefighters testified that when firefighter Brian Weinstein, who is Jewish, would enter a room, everyone would yell, "Oven," a reference to the Nazi concentration camps. Weinstein apparently made a joke in response, and also called himself "the token Jew" and made references to "my people." (Schnurle 44-45). Covert testified that when he was a student "bunker," he heard older firefighters using racial slurs occasionally, but these individuals retired before Covert joined the IFD in 1992; he had not heard racial slurs used since that time. (Covert 17-18).

With regard to epithets directed to Plaintiff personally, Plaintiff related that one day he was asking other co-workers to suggest unique names for a drag car he was building, and Lt. Trask said, in response to a question from Plaintiff, "What, Mark, dune coon?" (Hassan 99; Trask 52-54). Trask testified that Plaintiff appeared to find this humorous, (Trask 52-54), and Plaintiff testified that he "didn't give a lot more thought." Also, as noted above, Plaintiff alleges that AC Schnurle called him a "sand

-31-

nigger" or "towel head," and that FF Snell said "'your people don't know shit' and 'why don't you go back where you came from.'"

Plaintiff admitted at his deposition that he "[a]bsolutely" did not complain to anyone at the IFD that others' use of ethnic and racial slurs bothered him. (Hassan 96-98). Nor did Plaintiff mention his ethnicity or complain about co-workers' use of racial or ethnic epithets during either of the psychiatric evaluations he underwent. Plaintiff also admitted using ethnic slurs against himself when he is frustrated, and said he might have used them in front of other IFD employees. (Hassan 94-95). The Court notes that the City maintains policies prohibiting harassment of the sort alleged by Plaintiff, and Plaintiff failed to mention any of the conduct of which he now complains to Chief Wilbur and DC Dorman when they reviewed these policies with him in December 2005, years before his termination. Subsequent to this meeting, and prior to his November 2010, complaint with the EEOC, Plaintiff did not assert that he had ever been subjected to ethnic or racial epithets or harassment. (Hassan 95-98; Trask 101; Dorman 20-21, 89; Wilbur 174-75).

Here, Plaintiff has identified no more than "a few isolated incidents of [ethnic or] racial enmity" or "sporadic racial slurs," Schwapp v. Town of Avon, 118 F.3d 106, 110-11 (2d Cir. 1997) (citations and internal quotations marks omitted), over a 14-year period. These do not rise to the level of objective offensiveness

to create an actionable hostile work environment. See, e.g., Sanchez-Vazquez v. Rochester City Sch. Dist., No. 11-CV-6590 CJS, 2012 WL 2856824, at *4 (W.D.N.Y. July 11, 2012) ("[T]he handful of alleged comments by [plaintiff's immediate supervisor] over a period of four years are insufficient to create a hostile work environment.") (collecting cases). In light of Plaintiff's admitted failure to complain at *any* time about an allegedly hostile work environment, the Court finds that Plaintiff has failed to raise a genuine issue of material fact on the subjective component of a hostile work environment claim. See Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998) (stating that to be actionable under Title VII, an "objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, *and one that the victim in fact did perceive to be so*.") (citation omitted; emphasis supplied).

## 2.   Title VII Retaliation Claim

To establish a prima facie case of retaliation, a n employee must show that (1) he participated in a protected activity; (2) the employer was aware of the activity; (3) an adverse employment action was taken against him; and (4) a causal connection exists between the protected activity and adverse action. Papelino v. Albany Coll. of Pharmacy of Union Univ., 633 F.3d 81, 91 (2d Cir. 2011).

Plaintiff asserts that his removal from the payroll in April 2011 was done in retaliation for his filing of a complaint with the EEOC. As Defendants note, it is undisputed that Plaintiff did not complain about any alleged discrimination at the IFD until he filed his EEOC complaint on November 29, 2010, five months after being served on May 20th with the 2010 NOD seeking his termination. In April 2011, Plaintiff requested and received a right-to-sue letter from the EEOC, a copy of which was received by the City on April 12, 2011. About a week prior to that, on April 5, 2011, the City attorney informed the Union that, due to its inability or unwillingness to move ahead with the arbitration, Plaintiff's employment was terminated and he was being removed from the payroll, effective immediately.

Plaintiff attempts to show causation by asserting that the right-to-sue letter was issued shortly before he was removed from the payroll. However, these events cannot be used to establish the requisite causal relationship between a cognizable protected activity and the adverse employment action. First, the City did not receive a copy of the right-to-sue letter until April 12, 2011, a week after the City attorney notified the Union by letter dated April 5, 2011, that Plaintiff was being removed from the payroll. In other words, the alleged protected activity occurred *after* the adverse action, and therefore cannot be a "but for" cause of the adverse action. Furthermore, it is Plaintiff's filing of the EEOC

-34-

complaint, and not the EEOC's issuance of the right-to-sue letter, that is the relevant "protected activity" for purposes of Plaintiff's retaliation claim. See Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) ("The Ninth Circuit's opinion did not adopt [the employee]'s utterly implausible suggestion that the EEOC's issuance of a right-to-sue letter—an action in which the employee takes no part-is a protected activity of the employee."); see also Pocino v. Culkin, No. 09 CV 3447(RJD)(RLM), 2010 WL 3516219, at *3 (E.D.N.Y. Aug. 31, 2010). "Thus, no inference can be drawn from the temporal proximity between the date of the [right to sue] letter and the adverse action[ ]." Derosena v. General Bd. of Pensions & Health Benefits of United Methodist Church, Inc., 560 F. Supp.2d 652, 670 (N.D. Ill. 2008). Plaintiff's retaliation claim therefore fails as a matter of law.

### C.   Claims Under Section 1981

Plaintiff restates his discrimination, retaliation, and hostile work environment claims under Section 1981, which provides in pertinent part that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). Section 1981 discrimination claims are analyzed under the same substantive standard as used to analyze Title VII discrimination claims. See Hudson v. Int'l Business Machines Corp., 620 F.2d 351, 354 (2d Cir. 1980) (holding that the McDonnell

Douglas criteria should apply to Section 1981 claims). Because the standards of liability under the two statutes are the same, and because the Court has found that Plaintiff's Title VII claims fail as a matter of law, Plaintiff's Section 1981 claims necessarily must be dismissed as well.

### D.   Equal Protection Claims Under Section 1983

Plaintiff asserts a national-origin discrimination claim based on a violation of equal protection under the Fourteenth Amendment and 42 U.S.C. § 1983. Annis v. Cty. of Westchester, 136 F.3d 239, 245 (2d Cir. 1998). In analyzing whether conduct was unlawfully discriminatory for purposes of an equal protection claim of employment discrimination under Section 1983, courts "borrow the burden-shifting framework of Title VII claims." Id. Because Plaintiff's Title VII claims fail as a matter of law, his equal protection claims based on the same underlying factual circumstances also fail as a matter of law.

### E.   Claims Under the NYSHRL

Because the Court has dismissed of all of Plaintiff's federal claims, his claims under the NYSHRL also are dismissed. See Sadallah v. City of Utica, 383 F.3d 34, 39–40 (2d Cir. 2004) ("[B]ecause plaintiffs no longer have any viable federal claim, any remaining state law claims belong in state, rather than federal, court.") (citing United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966)).

**V.    Conclusion**

For the reasons discussed above, Defendants' motion for summary judgment (Dkt #66) is granted, and Plaintiff's amended complaint (Dkt #33) is dismissed in its entirety. The Clerk of the Court is directed to close this case.

**SO ORDERED.**

S/Michael A. Telesca

_____
HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:    October 13, 2015
          Rochester, New York

-37-